Trapp vs. The New Birdsall Co.

TRAPP, Respondent, vs. THE NEW BIRDSALL COMPANY, Appellant.

*February 27 — March 19, 1901.*

(1) *Special verdict: Undisputed facts.* (3, 4) Res adjudicata: *Several grounds of decision.* (2, 5, 6) Sales: *Breach of warranty: Notice: Waiver: Evidence.*

1. Where an essential fact is established by the undisputed evidence, a failure to include a finding in respect thereto in the special verdict is not prejudicial error.

2. A contract of sale of a traction engine provided that the vendee should give written notice of any failure of the machine to satisfy the warranty, to the vendor and also to the agent from whom it was received; that notice to either alone should not be sufficient; and that no agent should have power to waive any of the conditions of the contract. In an action by the vendee for breach of warranty, a failure to show that such notice was given to the agent from whom the machine was received is *held* fatal to a recovery, although the notice was given to an agent higher in authority and to the vendor.

3. Where the notice given in such a case was, on a former appeal, held insufficient as a matter of law, that decision was binding upon a second trial, the evidence being the same.

4. Every point in or assumed to be in a case, and considered and decided as a basis for the final conclusion reached, is as much *res adjudicata* as if it were the sole point in controversy and the only one upon which judgment could rest.

5. If the vendor of a machine acts in respect to remedying defects therein without the notice which the contract of sale calls for, such conduct waives the giving of any notice other than that upon which it is based; but the mere fact that an agent of the vendor visited the machine and attempted to make it work properly, after an insufficient notice had been given, without proof that he was sent by the vendor or that the vendor had knowledge of his conduct, does not show a waiver of the required notice, especially where the contract provides that no agent shall have power to waive any of its provisions.

6. In an action for breach of warranty that a traction engine sold to plaintiff was "capable of doing as much and as well as other machines of like size and proportions," the admission of evidence and

submission of the case to the jury on the theory that the warranty covered a fault in the size of the boiler, in that it was not large enough to enable the machine to develop as much power as other machines of the same nominal horse power, was error.

APPEAL from a judgment of the circuit court for Columbia county: R. G. SIEBECKER, Circuit Judge. *Reversed.*

Action for damages for breach of warranty of a traction engine manufactured and sold by defendant to plaintiff. The contract between the parties contained this provision:

"The purchaser agrees to carefully follow any directions given him by the *New Birdsall Co.*, in starting and operating the machinery, and after giving it a fair trial of one week, and it should not work well, to give written notice to the *New Birdsall Co.*, at Auburn, New York, stating wherein it fails, and also to give like notice to the agent from whom it was received. It is agreed that notice shall be given both to the company and the agent, and notice to either alone should not be sufficient. Reasonable time is to be allowed to get to it and to remedy the defects if any exist, the purchaser hereby agreeing to render necessary and friendly assistance. If it cannot be made to perform as guaranteed, it shall be returned to the place where received, and a new machine given in its place or the notes and money refunded. . . . It is expressly understood that no agent has any power whatever to bind the *Birdsall Company* by any agreement preliminary to, collateral with, or additional to the contract herein set out, or to waive any of the conditions of this agreement."

The warranty contained in the contract to which the foregoing related, was as follows: "The machines are well built, of good materials, and, with proper management, are capable of doing as much and as well as other machines of like size and proportions." "No agent has any authority to change this warranty." The breach relied on was that the engine was not capable, with proper management, of doing as much and as well as others of like size and proportions. The complaint contained appropriate allegations to show performance of the conditions precedent, contained in the contract,

to the right to sue and recover on the warranty. The answer raised the issue of whether the engine was capable of doing the work guaranteed and whether notice of any deficiency in that regard was given to defendant and its agent as the contract required.

It was insisted on the trial that the sole test of whether the machine came up to the warranty was whether it was equal in working efficiency to other machines of similar size and proportions, and that the mere question of whether it was sufficient to do the work plaintiff subjected it to or that which he had in view in buying it, or whether it would develop any particular number of horse power, was immaterial. The trial was conducted on that theory at times, and at others evidence was allowed, over objection by defendant's counsel, as to the working power of engines unlike the one in question in size and proportions; and other evidence was allowed on the theory that the test, under the warranty, related to power, regardless of the restrictive words of the warranty, "similar size and proportions," and remarks were made by the court along those lines.

The evidence on the subject of notice was in substance as follows: Plaintiff testified that he notified the agent at Fond du Lac and the defendant that the machine would not "do the work"; that a Mr. Sample wrote two letters for him, one of which was addressed to Mr. Dallman, the agent at Fond du Lac, and one to the company at Auburn, New York; that the substance of them was that the engine would "not do the work," and that he would not pay for it and would not accept it. Mr. Sample corroborated *Mr. Trapp* as to writing two notices and addressing them, but could not say as to the contents. The evidence of plaintiff given on a former trial was produced and was as follows: 'I supposed two notices were written, one to Mr. Dallman at Fond du Lac and one to the *Birdsall Company*. The substance was I could not keep up steam. I do not know about

stating engine would not work as guaranteed. I know one notice was addressed to Dallman. I am not sure about the other. I cannot tell for certain whether there was one notice or two. I am not quite sure about that.'

The evidence on the other question litigated was in sub- stance as follows:

Testimony of plaintiff: 'I bought the engine of Mr. John Prien, defendant's agent at Columbus, Wisconsin. I started it August 7, 1895. It did not work satisfactorily. In a few days I notified Mr. Prien. Abel was sent to examine it,— sent by Mr. Dallman, the agent at Fond du Lac, I suppose. I followed his directions in operating the machine, but it did not work any better. It worked hard every way. After sending the notice, Mr. Glassnap, an engineer from Fond du Lac, came and did some work on the engine, but did not materially improve it. He came a second time, according to a promise made by the Fond du Lac agent, but did not improve the machine. I delivered it back at Columbus, to the agent of whom I purchased it, and demanded back my notes. I operated an engine of the same make, rated at twelve horse power, three less than the one in question, having a boiler, however, of the same size, but a smaller fire box. It did the better work. The new machine did not run right, but I could not discover the cause.'

Evidence of John Prien: 'I sold the engine to plaintiff as agent for defendant at Columbus, Wisconsin. *Trapp* came to me with complaints soon after he started it. I do not remember of seeing any written notice from him. I sent an agent to fix the engine.'

Evidence of Henry Trapp: 'The engine did not seem to have strength enough. It worked when we had steam enough. If we had lots of steam it would work all right. Otherwise the motion would run down. The governor did not regulate it right. I have worked considerable around engines.'

Evidence of Thomas McBurnie: 'I worked around the engine. They could not keep up steam. I did not notice anything about it different from other machines. I thought it ran hard, that's all.'

Testimony of Horatio Smith: 'I went to *Mr. Trapp's* place to examine the engine. It was then carrying eighty pounds of steam. It was working hard, as if it had more load than it really could pull. They could not get the steam above eighty. I am familiar with the power required to operate a machine as they were operating at that time. It would take about ten horse power. (*Under objection:* I do not think the machine could do as much or as well as another engine of like size and proportions.) I refer to the Buffalo Pitts. I don't know the relative proportions of the two engines. (*Under objection:* I have seen a good many engines working. I made up my mind that *Trapp's* engine was not working right—working too hard. I have seen other engines run the same rigs and do it a good deal easier.) I don't think the engine was properly adjusted. It seemed to work too hard. The governor was not right. It is the duty of the engineer to take care of that. The trouble with the governor on the occasion in question was perhaps partly the fault of the machine and partly the fault of the engineer.'

Testimony of John Ashworth: 'I have had fifteen years' experience in operating threshing-machine engines, and saw the engine in question in operation and looked it over. It seemed to run awful hard. Something was not right or adjusted right. The governor did not appear to be working right. I held it to assist the working, but it did not make any difference. When I saw the machine working it was when *Trapp* started it up. They were not threshing, just trying the machinery. As a general thing in a new machine the governor does not have to be limbered up much. If the trouble was in the band wheel or the binding of the shaft in the boxes the engineer could have fixed it.'

Evidence of John Findlay: 'I have handled steam thresh-ing machines for seventeen years. I have run *Trapp's* rig with a Nichols & Shephard engine, and with a Rumley en-gine rated at fifteen horse power, and I think *Trapp's* was. My own was the largest.'

Evidence of G. A. Batz: 'Have had seventeen years' ex-perience operating steam threshing machines. Am ac-quainted with the Birdsall engine in dispute, and have seen it in operation hulling clover with a clover huller. It re-quired a hundred pounds of steam to operate the huller. It took two men to turn the fly wheel in putting on the belt, It bound somewhere. The hand of one man ought to have been sufficient. I have used twelve different engines and been with nine of them myself. Among them was the Stevens engine and the Pitts. They were about the same size as the one in question. There was also the Gaar-Scott, which was about the same size. I never measured them. I am only guessing. I think the Gaar-Scott was a little larger in the boiler. It was about the same size and proportions as *Trapp's* engine. Might have been a little larger but not much. It was able to develop about eight horse power, while *Trapp's* engine would develop but about seven, in my judgment, because they could not keep up steam. I know William Burlin's ten horse power Pitts engine and have seen it in operation. (*Under objection:* The engine in ques-tion would not develop as much power in operating a thresh-ing machine as the Pitts engine owned by Burlin.) I have a Port Huron engine, now, rated at sixteen horse power. Be-fore, I had a Pitts engine. It was larger than the Birdsall. What I said about the horse power of the engines is a guess. I don't think the ten horse power Pitts engine was much different in size from *Trapp's* engine, but I never made any measurements.'

Testimony of William Burlin: 'I own a Buffalo Pitts en-gine rated at ten horse power. Have had it eleven falls. Mr. Bradshaw has measured my engine. I was present.'

Testimony of James Bradshaw: "I am a mechanical engineer. Have had many years of experience. I have measured the engine in question, the so-called 'fifteen horse power Birdsall engine.' The engine will develop a trifle over twelve horse power. I have measured the Buffalo Pitts engine that has been spoken of. The two engines are the nearest in size of any I have compared the Birdsall with. The Birdsall will develop about one and nine-tenths horse power more than the Pitts. The latter is rated at ten horse power. The Birdsall engine has less square feet of heating surface and grate surface per rated horse power than any engine I have measured. (*Under objection:* In operating the Birdsall engine with another of like size and proportions, in my judgment as a mechanical engineer, it will not do as good work and as well as a machine of a different make.) The Birdsall engine has the smallest steam space of any engine I have measured. It prevents the engine from maintaining its steam.' *By the Court:* "And if it did generate the steam, would it have greater or less power?" *A.* 'It would have greater. That is the fault of the construction. The result is it is impossible to get steam in the boiler. You haven't sufficient steam space. The engine is all right but there isn't sufficient generating capacity for steam. The fault I find with the engine is in the steam surface and the grate surface,— lack of generating power in the boiler, lack of heating surface. There is not a fifteen horse power engine in the United States that has a boiler of that size, that I know of. I know engines rated at ten horse power that have larger boilers. The engine was a prettly fairly-constructed engine. I did not see anything the matter with the construction. The only reason I can assign for the band wheel being tight is that the engine is either out of line, the shaft is out of line, or screwed up too tight, or the piston ring is too tight. There is no doubt about the engine being large enough to develop fifteen horse power if the boiler were large enough.

Not a bit. If we had another engine built with a boiler of the same size as the Birdsall it would not develop any more power. No other engine built like this engine would develop any more power. The Buffalo Pitts engine has 12.6 feet of surface per rated horse power, while this engine has 9.9.' *Q.* "So that the two engines are not alike, of like size and proportions?" *A.* No. *The Court:* "He says that they are. He says that the difference lies in this: not in like size and proportions, but in the ratio of the capacity to generate steam per horse power. Is that the difference?" *The witness:* 'Any other boiler with the same amount of heating surface would develop the same power as the Birdsall. Your engine falls off in heating surface.'" *Q.* "Then the engines are not alike?" *The Court:* "Well, I must suggest that you must not confuse the jury by assuming that the simple fact of construction is the basis of this law-suit. It is the question of horse power, and that is the warranty. We must stay by the warranty." (*This remark of the court was objected to.*) *The Court:* 'What we want to know, Mr. Bradshaw, is, Does the engine in question have the same boiler capacity that others of like horse power have? *A.* No, sir, nor of smaller horse power. Any other engine with the same boiler would not develop any more power. An engine would develop more power with a balance valve, probably twenty per cent. more.'

Testimony of J. H. Algard: 'I have been in the business of operating engines, building and handling them, for twenty years. Am the owner of a Stevens traction engine. (*Under objection:* 9.9 feet of heating surface per horse power is not sufficient.) The Stevens engine has thirteen and a fraction feet of heating surface per horse power. (*Under objection:* My engine is capable of developing and maintaining more horse power than the Birdsall engine.)'

Evidence was given on the part of defendant to the effect that no notice of a breach of warranty was received from

plaintiff at Auburn, New York. On rebuttal there was evidence to the effect that from fifteen to sixteen horse power was required to run *Mr. Trapp's* threshing-machine rig.

At the close of the evidence defendant's counsel moved for the direction of a verdict, which was denied. The cause was submitted to the jury for a special verdict, which resulted in the following findings on the questions for consideration on the appeal: With proper management the engine in question was not capable of doing as much work and as well as other engines of like size and proportions. Fifteen horse power was required to run and operate plaintiff's threshing machine outfit. Plaintiff gave written notice to defendant at Auburn, New York, stating wherein the engine failed to do well.

Defendant moved to set aside the verdict and for a new trial, which motion was denied. Judgment was rendered in plaintiff's favor upon the verdict, from which this appeal was taken.

*Maurice McKenna*, for the appellant.

For the respondent there was a brief by *J. J. Sutton* and *Paul D. Durant*, and oral argument by *Mr. Durant*.

MARSHALL, J. Respondent's right to recover depended primarily on a solution in his favor of one or both of these questions: (1) Was the machine well built and of good material? (2) Was the machine capable, with proper management, of doing as much and as well as other machines of like size and proportions? Either or both of such questions being established for respondent, his right to recover turned on the solution in his favor of these further questions: (3) Was written notice given to agent Prien, from whom the machine was received, and to appellant at Auburn, New York, stating in what respect the machine failed to satisfy the guaranty? (4) Did appellant, after having reasonable

time therefor and the friendly aid secured by the contract, fail to make the machine satisfy the guaranty? (5) Was the machine returned to the place where it was received from appellant?

Appellant's first assignment of error is that the verdict does not cover all the questions mentioned. Complaint is made that there is no finding that the machine was returned to the place where it was received. It is deemed sufficient to say on this point that there was ample undisputed evidence to sustain it. Appellant's counsel admitted that the machine was received by respondent at his farm in the town of Hampden, Columbia county, Wisconsin, and proof was made that it was returned to such place after respondent claims that notice of the breach of warranty was given and the other circumstances occurred entitling him to rescind the contract of sale, and that appellant's agent, after such return, was notified thereof and that it was subject to appellant's control. So the failure to make a finding on that point is immaterial. It has often been said that where an essential fact is shown by the evidence to exist beyond reasonable controversy, a failure to include a finding in respect thereto in the special verdict, where one is taken, is not prejudicial error, if error at all. *Bell v. Shafer*, 58 Wis. 223; *Baxter v. C. & N. W. R. Co.* 104 Wis. 307, 313.

There is, however, an insuperable defect in the verdict, and in the evidence. The contract required, as a condition of a rescission of the sale, that written notice of any failure of the machine to satisfy the warranty should be given *to the agent from whom it was received* and to appellant at Auburn, New York, specifying wherein such failure consisted; that notice to one should not be deemed sufficient to satisfy such requirement, and that no agent should have the right to change the warranty, or bind appellant, by any stipulation not contained in the contract as signed, or to waive any of its conditions. There was no finding by the.

jury that a notice in writing was given to the agent from whom the machine was received, nor was there evidence to that effect. There was an attempt to satisfy the requirement of the contract on that point by proof that a written notice was given to agent Dallman at Fond du Lac, Wisconsin. If that was sufficient, a finding of the jury was not necessary, as it was not seriously disputed but that such a notice was given. The difficulty is that the machine was not received from Dallman, but from agent Prien at Columbus. It seems that Dallman was somewhat higher in authority or of greater experience than Prien, or that there was some other cause that led respondent to deal with him as much or more than with Prien after the machine was purchased. Yet the evidence is undisputed that the purchase was made of Prien, that the machine was received through his agency, and that it was to him that written notice of breach of warranty should have been sent.

There is a further defect in the notice. The question in that regard seems to have been passed upon on the former appeal. *Trapp v. New Birdsall Co.* 99 Wis. 458. The contract required, as before indicated, that the notice should specify wherein the machine failed to satisfy the warranty. The evidence before was to the effect that the notice informed appellant that the " engine would not do the work," and that respondent would "not accept it or pay for it." On the last trial the evidence was the same. When the case was here before it seemed that saying " the machine will not do the work," coupled with the statement, "I will not accept it or pay for it," clearly did not satisfy the provisions of the contract. Therefore we decided that the notice was insufficient, saying that it manifestly did not inform appellant that the machine would not come up to the warranty, but did contain information that it would not successfully operate respondent's threshing-machine outfit. It was then thought, and the decision was in accordance therewith, that

when respondent said he would not keep the machine or pay for it, thereby foreclosing in advance any offer to remedy the difficulty complained of, the natural conclusion was that such difficulty was that the machine did not have sufficient capacity to operate respondent's threshing-machine outfit. That construction of the notice was in harmony with all the evidence in the case. The language of the notice, if ambiguous at all, was not so in its literal sense, in the light of the evidence. There was no case of ambiguity under circumstances warranting a resort to extrinsic evidence in arriving at the truth, from which evidence conflicting reasonable inferences might be drawn, making a jury question under rules governing the construction of the language of contracts. *Vilas v. Bundy*, 106 Wis. 168. The evidence being the same now, the former decision precludes a reconsideration of the matter. The court having once spoken, whether the decision was right or wrong, what was said must stand as the truth for the purposes of this case. The doctrine is familiar, and is unbending, that when a point is once decided in a case, and the time has passed for a review thereof, that decision must ever thereafter be received between the parties, on the question involved, as the truth. "*Judicia sunt tanquam juris dicta et pro veritate accipiuntur.*"

There is no escape, as it seems, from the foregoing conclusion. How the learned trial court came to overlook the fact that on the former appeal the notice was held insufficient as a matter of law and the rule that the decision thus made was binding on a second trial, the evidence being the same, is not perceived. Possibly it resulted from the fact that because, in an orderly consideration of the case here, after holding that the notice was insufficient, the contrary was assumed, hypothetically, as a basis for consideration of a further question, likewise held to call for a reversal of the judgment, it was supposed that the judgment finally turned

solely on the last point decided, and that the decision on
that point only was to be considered *res adjudicata.* It is
not infrequent that the rule is advanced that nothing is *res
adjudicata* in a case except the particular point necessary to
the decision. That is an extreme view of the doctrine of
*res adjudicata.* It is resorted to sometimes by counsel to
avoid the force of an adverse decision, and sometimes, seem-
ingly, by courts as a justification for changing their position
without distinctly overruling anything previously said. Such
extreme doctrine has not found favor in this court. *Buchner
v. C., M. & N. W. R. Co.* 60 Wis. 264; *Brown v. C. & N. W.
R. Co.* 102 Wis. 137, 154; *Hart v. Moulton,* 104 Wis. 349. A
study of those cases will show that every point in or assumed
to be in a case, and considered and decided as a basis for the
final conclusion reached, is as effectually decided as if it
were the sole point in controversy and the only one upon
which judgment could rest. If that were not the case, when,
in the orderly consideration of assignments of error on ap-
peal, either of several are held to support the final deter-
mination reached, it would be easy thereafter, in using the
decision as authority, to so shift one's position — claiming
at one time that a particular point was all that was neces-
sary thereto, and that what was said on other points was
*obiter,* and at other times that one of such other points was
all that was necessary to the decision, and that what was said
on others was entirely unnecessary and should be considered
as *obiter* — as to render the decision useless for any other
purpose than the particular relief granted in the case.

Respondent's counsel say that, admitting that notice was
not given of the failure of the machine to satisfy the war-
ranty, as required by the contract, that was waived by the
fact that the notice which was given was recognized and
acted upon, an agent of appellant having visited the machine
and endeavored to make it perform as guaranteed. The
doctrine is familiar that under such a contract as the one

here, if the seller acts in respect to remedying defects in the machine, without the notice which the contract calls for, the omission to insist upon such notice effectually changes the contract so as to make it conform to the conduct of the parties; that such conduct waives the giving of any notice other than that upon which it is based. *Kingman & Co. v. Watson,* 97 Wis. 596; *Sandwich Mfg. Co. v. Feary,* 40 Neb. 226; *Davis' Sons v. Butrick,* 68 Iowa, 94; *Wendall v. Osborne & Co.* 63 Iowa, 99; *Mass. L. & T. Co. v. Welch,* 47 Minn. 183; *Sandwich Mfg. Co. v. Trindle,* 71 Iowa, 600. The difficulty in applying that doctrine to the evidence in this case is that there is no evidence that appellant acted on the defective notice if one was sent. There is evidence that one of appellant's agents visited the machine after the notice is claimed to have been given, but there is no evidence that he was sent by appellant or that appellant had knowledge of his conduct. The mere fact that the agent so acted did not bind appellant. The contract expressly provided that no agent should possess authority to add to it in any way or to waive any of its provisions. It follows, as contended by appellant's counsel in the court below, as appears by the record, and here also, that there was an entire failure of proof in respect to compliance with the contract on the subject of notice of the alleged insufficiency of the machine, and that there was no evidence to establish a waiver of the notice. Hence the case should have been taken from the jury as requested by appellant's counsel. *Nichols & S. Co. v. Chase,* 103 Wis. 570.

If we could have passed successfully the obstacles already referred to in the way of supporting the judgment, it would nevertheless have to be reversed because of errors committed on the trial, hereafter referred to.

It was plainly decided on the former appeal that the warranty was not that the machine would develop its rated or any particular amount of power, nor that it would operate

Trapp vs. The New Birdsall Co.

*Mr. Trapp's* threshing-machine outfit, but that it would do as much and as well as other machines of like size and proportions; not as much as any other machine in existence of the same size and proportions, as seems to have been understood on the second trial, but as other machines — machines generally — of like size and proportions. At the commencement of the trial the line laid down by this court for future guidance in the cause appears to have been fairly understood by the trial court, but the persistent efforts of respondent's counsel to place before the jury the fact that the machine would not successfully operate *Mr. Trapp's* threshing-machine outfit though its rating was equal to the task, and that other machines of a lower rating would do the work, seem to have finally led the court to fall into the same error as before, to a sufficient degree at least to confuse the jury and render it quite probable that the real question at issue was not passed upon by them.

There is no need to prolong this opinion by referring at length and in detail to the numerous questions that were allowed over objections made by appellant's counsel, and remarks made by the judge that were also duly objected to, showing want of comprehension of the real question for investigation, namely, Was the machine capable of doing as well and as much as other machines of the same size and proportions? The following are a few of the many instances that might be referred to.

Horatio Smith, an expert, was allowed to testify generally, that he did not think the engine in question would do as well as another machine of like size and proportions. On his cross-examination it appeared that the other machines that he had in mind in giving his testimony were dissimilar in size and proportions to the one in question, so far as he knew; that he had never measured any of them and that his evidence was merely guesswork; that so far as he had in mind any basis for his testimony, it was the rated horse

power of different machines. In no other respect were the machines mentioned and the one in question similar in size and proportions. Notwithstanding that situation, a motion to strike out the expert's testimony was denied.

After respondent's chief expert, Bradshaw, had declared over and over again that the engine in question developed all the power that could be expected of one with the same sized boiler and the same amount of heating surface, that it would develop as much as any other engine of the same construction, and that the difference between the power of the machine and others was accounted for by the fact that the former had a smaller boiler and less heating surface than the latter — that it and other machines mentioned were not of like size and proportions — and in the face of an emphatic declaration to that effect, the trial court broke in with the remark: "He says they are. He says that the difference lies in this, not in like size and proportion, but in the ratio of the capacity to generate steam per horse power," closing with the interrogatory to the witness, "Is that the difference?" to which the witness answered, "Yes, sir, the ratio per horse power." The court then, addressing appellant's counsel, said: "And he says the same thing is true between your engines rated twelve or fifteen." Witness Bradshaw had already testified to the simple fact, not requiring the knowledge of an expert to understand, that the power of an engine with its boiler depends on the steaming capacity of the latter and on the capacity of the former to convert steam pressure into motive power, and if the latter is rated at a sufficient amount to develop fifteen horse power, yet the boiler with its fire box is only equal in steaming capacity to ten horse power, that is the limit of the power of the machine. If the learned court did not have in mind the idea that a fifteen horse power engine, according to its rating, with only effective heating surface sufficient to generate steam to work the engine up to twelve horse power,

and an engine of the same rated horse power with a boiler having steaming capacity sufficient to work the engine up to nine horse power, were not dissimilar in size and proportions, he certainly conveyed that idea to the jury and led the witness to do the same, though the latter had repeatedly said before, and also said afterwards, that the undersized boiler in the machine in question was the cause of the small capacity thereof in comparison with its rated horse power.

After the occurrence above referred to, and upon the witness Bradshaw again testifying that the undersized boiler in the machine was what made it deficient in power, it being, as he said, smaller than in any other machine of a like-rated horse power that he had ever seen, appellant's counsel, to obtain a declaration from the witness in the nature of a necessary conclusion from what he had said, asked this question: "Then the two engines are not alike?" Without giving the witness time to answer, the court said: "Well, I must suggest that you must not confuse the jury by assuming that the simple fact of construction is the basis of this lawsuit. It is the question of horse power, and that is the warranty." At that point, evidently, the effect of the previous decision of this court had ceased to guide the trial. The idea was prominent that respondent purchased a machine guaranteed to develop a certain amount of horse power and was entitled to recover if the effective horse power was not as much in proportion to the rated horse power as other machines. Nothing had been said in the case, up to the time the remark quoted was made, about construction of engines, that did not bear on dissimilarity of size and proportions between the engine in question and other machines, so the jury must have understood by such remark that respondent was entitled to an engine capable of developing as much effective horse power per rating as other machines developed, regardless of physical size and proportions. Later, and immediately following the witness's explanation

that the capacity of a boiler and its connections in effective heating surface is vital as regards size and proportions of an engine, the court said to the witness: "What we want to know is, Do you find that this engine in question has the same boiler capacity that others of like size and proportions have?" to which the witness answered: "No, sir, no; nor one of smaller horse power." The witness having, as indicated, many times testified that the engine had as much boiler capacity per actual horse power as other engines, but that he had never seen one with such small boiler capacity with an engine so large, the only reasonable conclusion from the remark of the court is that the judge had in mind boiler capacity to rated horse power, and that he, in effect, told the jury that similarity of size and proportions, between the machine in question and others, depended on that, and the witness answered accordingly. There can be no mistake about that, as the witness later testified emphatically that no other machine of the same size and proportions in every respect would develop any more power.

The erroneous and prejudicial ideas thus placed before the jury for their guidance were emphasized and given all the significance possible without specific instructions from the bench, by inserting, as a part of the special verdict, this question: "How many horse power was required to run and operate plaintiff's Advance separator with his feeder, bagger, and blowstacker attachments?" The answer of the jury was, "Fifteen horse power."

By the foregoing brief review of errors committed in presenting the evidence to the jury, it is manifest that appellant has not had a fair trial. The case was tried on a false theory, substantially the same as before. If there is any difference between the two trials it is in the degree only in which the court departed from the true line. In the first instance a wrong theory was sustained from the beginning to the end; in the last, a right start was made, in accord-

ance with the decision of this court, but the end was sub-
stantially the same as before.   True, the jury decided in
form, in answer to one of the special questions, that the
machine was not capable of doing as much and as well as
other machines of like size and proportions, but it is prob-
able, if not reasonably certain, that since it required fifteen
horse power to operate *Mr. Trapp's* threshing-machine out-
fit, and the machine in question was purchased to do that
work, and other machines of like-rated horse power or less
were equal to the task but the former was not, the jury
said it was not capable of doing as much and as well as
other machines of like size and proportions within the mean-
ing of the guaranty.

It is significant that counsel for respondent admit in the
printed brief, as we understand it, the correctness of the
foregoing.   But they say that the construction of the con-
tract of warranty contended for by appellant is unreason-
able; that to hold that it means just what it says, i. e. that
the machine is as good in working efficiency as other ma-
chines of the same size and proportions, is to give no effect
to it for the purchaser's protection, therefore that some
other construction should be adopted.   To that there are
several answers: First, the point was fully settled on the
former trial and is not now open to change.   It is respond-
ent's misfortune that he secured a verdict by counsel's fail-
ure to regard the plain rule laid down for the second trial,
and persistence in such failure till the trial court was swung
away from the safe position first taken.   Second, since the
language of the guaranty is so plain that it does not admit
of any other construction than that given to it, a resort
cannot be had to judicial construction to turn a bad into a
good contract.   If parties, with their eyes open, will make
unreasonable contracts, courts cannot save them from the
consequences thereof.   Third, the warranty, as it reads,
evidently covers all that the seller was willing to guaranty.

It bound itself to make good any defect in material and workmanship, and any deficiency in working power as compared with machines made by others, of the same size and proportions. There was a careful avoidance of any stipulation that the machine would develop any particular amount of horse power. It contemplated that the seller should not be held responsible for any fault in respect to the mere size of the boiler, in that it was not large enough to supply sufficient steam to the engine to work it up to the power of other machines having a similar sized engine in rating. The guaranty was of the machine as it was, not as it would be with a larger boiler. There is nothing so very unreasonable about that, so long at least as there was no hidden meaning in the words used to express what was intended.

It seems that we make no mistake in saying that respondent's counsel admit that the case was tried and submitted to the jury on the theory that want of a boiler large enough to develop as much power as other fifteen horse power engines was covered by the warranty. They say appellant's counsel should not complain, since it was shown by unmistakable evidence that the defective proportions of the engine were what rendered it incapable to come up to other machines of like size and proportions. To make that sensible, we must conclude that "defective proportions" in counsel's statement, refers to the idea that the boiler was too small, and the heating surface of furnace and boiler too little, and that by the term "similar size and proportions" they refer to rated horse power, though it is difficult, it must be admitted, to get that sense out of the expression or determine just what counsel means. We are aided by a branch of their argument further along in the brief, under the heading, intended, as it appears, to give it particular significance: "Lack of horse power of the machine was caused by its undersized boiler." As it was distinctly said on the former

trial, and is now affirmed, that the warranty did not insure against an undersized boiler, counsel's argument amounts to an admission that the judgment is erroneous.

*By the Court.*— The judgment of the circuit court is reversed, and the cause remanded for a new trial.